**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DIAMOND-DONNELL D. BLAIR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:23-cv-00286-MTS |
| | ) | |
| ALLEN HUGHES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the motion of plaintiff Diamond-Donnell D. Blair for leave to commence this civil action without prepayment of the required filing fee. (Docket No. 2). Having reviewed the motion and the financial information submitted in support, the Court has determined that plaintiff lacks sufficient funds to pay the entire filing fee, and will assess an initial partial filing fee of $8.37. *See* 28 U.S.C. § 1915(b)(1).

Additionally, for the reasons discussed below, the Court will dismiss the official capacity claims against defendants Allen Hughes, Michael Miller, Brian Boyer, Unknown Acting Warden, Unknown Chief Administrator, Sarah Miller, E. Henson, and the Unknown Censorship Committee Members. The Court will also dismiss the First Amendment claims against defendants Michael Miller, Boyer, Unknown Acting Warden, Unknown Chief Administrator, and Sarah Miller in their individual capacities, as well as the Fourteenth Amendment claims against all defendants in their individual capacities. However, the Court will direct the Clerk of Court to issue process on defendant Jason Lewis in both his official and individual capacities as to plaintiff's claims under the First Amendment, and on defendants Hughes, Henson, and the Unknown Censorship

Committee members in their individual capacities as to plaintiff's claims under the First Amendment.

## 28 U.S.C. § 1915(b)(1)

Pursuant to 28 U.S.C. § 1915(b)(1), a prisoner bringing a civil action in forma pauperis is required to pay the full amount of the filing fee. If the prisoner has insufficient funds in his or her prison account to pay the entire fee, the Court must assess and, when funds exist, collect an initial partial filing fee of 20 percent of the greater of (1) the average monthly deposits in the prisoner's account, or (2) the average monthly balance in the prisoner's account for the prior six-month period. After payment of the initial partial filing fee, the prisoner is required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. 28 U.S.C. § 1915(b)(2). The agency having custody of the prisoner will forward these monthly payments to the Clerk of Court each time the amount in the prisoner's account exceeds $10.00, until the filing fee is fully paid. *Id.*

In support of his motion for leave to proceed in forma pauperis, plaintiff has submitted a copy of his inmate account statement. (Docket No. 4). The account statement shows an average monthly deposit of $41.84. The Court will therefore assess an initial partial filing fee of $8.37, which is 20 percent of plaintiff's average monthly deposit.

## Legal Standard on Initial Review

Under 28 U.S.C. § 1915(e)(2), the Court is required to dismiss a complaint filed in forma pauperis if it is frivolous, malicious, or fails to state a claim upon which relief can be granted. To avoid dismissal, a plaintiff must demonstrate a plausible claim for relief, which is more than a "mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw upon judicial experience and common sense. *Id*. at 679. The court must "accept as true the facts alleged, but not legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). *See also Brown v. Green Tree Servicing LLC*, 820 F.3d 371, 372-73 (8th Cir. 2016) (stating that court must accept factual allegations in complaint as true, but is not required to "accept as true any legal conclusion couched as a factual allegation").

When reviewing a pro se complaint under 28 U.S.C. § 1915(e)(2), the Court must give it the benefit of a liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). A "liberal construction" means that if the essence of an allegation is discernible, the district court should construe the plaintiff's complaint in a way that permits his or her claim to be considered within the proper legal framework. *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015). However, even pro se complaints are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980). *See also Stone v. Harry*, 364 F.3d 912, 914-15 (8th Cir. 2004) (stating that federal courts are not required to "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint"). In addition, affording a pro se complaint the benefit of a liberal construction does not mean that procedural rules in ordinary civil litigation must be interpreted so as to excuse mistakes by those who proceed without counsel. *See McNeil v. United States*, 508 U.S. 106, 113 (1993).

### The Complaint

Plaintiff is a self-represented litigant who is currently incarcerated at the Crossroads Correctional Center in Cameron, Missouri. At the time relevant to the complaint, however, he was

an inmate at the Eastern Reception, Diagnostic and Correctional Center (ERDCC) in Bonne Terre. Plaintiff brings this civil action pursuant to 42 U.S.C. § 1983, naming twelve separate defendants: (1) Deputy Warden Allen Hughes; (2) CCM II Michael Miller; (3) Deputy Division Director Jason Lewis; (4) Functional Unit Manager Brian Boyer; (5) Unknown Acting Warden; (6) Unknown Chief Administrative Officer; (7) Sarah Miller; (8) Unknown Henson; (9) #1 Unknown Censorship Committee Member; (10) #2 Unknown Censorship Committee Member; (11) #3 Unknown Censorship Committee Member; and (12) #4 All Unknown Censorship Committee Members of Novel *Perfect*. (Docket No. 1 at 2-7). All defendants are sued in both their official and individual capacities. In the complaint, plaintiff alleges that his constitutional rights were violated when he was not allowed to obtain a copy of a self-published novel that he had written.

In the first section of his "Statement of Claim," plaintiff begins by asserting that he is an African-American incarcerated in the Missouri Department of Corrections, where he is serving a sentence of life plus fifty years. (Docket No. 1 at 8). In May 2022, he completed a novel titled *Perfect*, which he self-published on Amazon. Plaintiff states that he "does not benefit financially from the sales of the novel, and has not signed a contract to benefit."

In June 2022, plaintiff asserts that his fiancé "ordered a copy of the novel *Perfect* for [him] to read and possess." The novel, which plaintiff explains is part of the "urban genre," was delivered to the ERDCC by Amazon. However, plaintiff never received the novel "through the prison's mailing/mail delivery procedures." (Docket No. 1 at 9).

According to plaintiff, Mailroom Clerk Henson flagged the novel after realizing that plaintiff was the author. Henson notified then-Warden David Vandergriff, informing Vandergriff of the circumstances. As a result, the novel was withheld from plaintiff for thirty to forty days, and he was "threatened" by being advised that he had to either pay to mail it back, or sign a consent

4

form that authorized his visitor to pick it up. Plaintiff was further told that if he did neither, staff would dispose of the book. Eventually, he consented to have his fiancé pick the novel up during a visit.

Plaintiff states that he does not think or express himself in a similar manner to "white, Asian, or other authors of different ethnic and racial backgrounds." He claims that because of his race, his "freedom of expression is being interfered with by the listed defendants," and that he is being restricted to reading material "written by predominantly white authors." Plaintiff asserts that defendants have "contrived and schemed to interfere with his rights to write for publication" due to his race and incarcerated status, and that he fears punishment for further attempts to write for publication.

In the second section of his "Statement of Claim," plaintiff accuses defendants Michael Miller, Henson, Boyer, Hughes, Unknown Acting Warden, Unknown Chief Administrative Officer, and the Unknown Censorship Committee Members of violating his right to free expression by deliberately exaggerating and fabricating falsehoods regarding his novel. (Docket No. 1 at 10). He asserts that the Missouri Department of Corrections has a censorship policy governing both ingoing and outgoing mail. This policy is supposed to guide the actions of correctional staff, and describes "why mail may be censored." In particular, plaintiff states "that mail may be censored if it depicts, describes or encourages activities which may lead to criminal violence or group disruption," or if it "contains nude pictures or sexually explicit content." Plaintiff alleges that defendants "did not comply with the censorship policy of MODOC," and "created falsehoods to deliberately censor and ban [his] novel *Perfect*."

With regard to defendant Henson, plaintiff contends that Henson is the clerk of the ERDCC's mailroom. He notes that prison mail procedures require that all offender mail "be

processed through the institution mailroom." (Docket No. 1 at 11). However, policy also provides "that mailroom staff shall not make censorship decisions."

When plaintiff had not received his book within three days of its delivery to the mailroom, plaintiff contacted CCM II Miller and CCM Kleber. According to plaintiff, he "was blown off." He then reached out to his fiancé to tell her the problem, and she contacted a staff member named Shipley in the property room. Shipley told plaintiff's fiancé "that the novel had not been delivered to the property room and…is probably in the mailroom being censored."

On July 7, 2022, plaintiff's fiancé allegedly spoke with defendant Henson, who informed the fiancé that plaintiff's "novel contains sexual inappropriateness, violence, and pictures." Plaintiff states that his fiancé "questioned Henson's censorship decision," and denied that the novel contained photos. Henson replied by telling the fiancé that the warden specifically requested the file on plaintiff and his novel.

Plaintiff insists that "Henson, as mailroom clerk, made a prohibited decision to censor [his] novel based on her personal beliefs." He states that "Henson fabricated the falsehood that [his] novel *Perfect* contained sexually explicit inappropriateness and pictures, and violence." As such, plaintiff asserts that Henson intended to deny him his rights under the First Amendment.

As to defendants Michael Miller, Boyer, Hughes, and Unknown Acting Warden, plaintiff states that he filed an informal resolution request (IRR) on July 22, 2022, which is the first step in the grievance process. (Docket No. 1 at 12). Plaintiff explains that at the IRR stage, an informal discussion is to be held, and that there should be an answer within forty days. However, CCM II Miller allegedly delayed responding to the IRR for 180 days, and did not receive a response until November 17, 2022. Additionally, plaintiff states that CCM II Miller "forged [plaintiff's] signature as 'Refused to Sign'" in order to "cover up for [defendants'] arbitrariness in falsifying the reasons

to censor" his novel. According to plaintiff, CCM II Miller did not have a discussion with him, and accuses him of falsifying the IRR form.

Aside from CCM II Miller, plaintiff states that Boyer and Unknown Acting Warden responded to his complaints by saying that "his novel was censored in accordance with policy and procedure." (Docket No. 1 at 13). Plaintiff asserts that this is a "falsehood" that CCM II Miller, Boyer, and Unknown Acting Warden perpetuated to deny him his rights.

On October 21, 2022, plaintiff received an interoffice communication that he states is authored by defendants Hughes and CCM II Miller.[1] In this document, plaintiff states that both Hughes and CCM II Miller falsified their reasons for denying his novel. Specifically, the document provides that incoming mail can be censored if it "depicts, describes or encourages activities which may lead to criminal violence or group disruption," and also if it "contains nude pictures or sexually explicit materials." According to the interoffice communication, plaintiff's novel contained prohibited content, and therefore his IRR was invalid.

Concerning the Unknown Censorship Committee Members, the Unknown Chief Administrator, Sarah Miller, and Deputy Division Director Lewis, plaintiff notes that the Unknown Acting Warden "may designate staff to screen and approve incoming publications." He states that "institutional policy" provides that "mailroom staff shall not make censorship decisions," but that Mailroom Clerk Henson "made decisions to censor [his] novel," which violated the First Amendment. (Docket No. 1 at 14). He insists that Henson's action also violated his right to due process and "his right to unbiased censorship hearings and procedures."

On January 4, 2023, plaintiff received a grievance response from his complaints about Henson. He alleges that both the Unknown Acting Warden and Sarah Miller "falsified" the

---

[1] The Court notes that plaintiff has attached this communication as an exhibit, and it appears that Hughes is the author of the Inter-Office Communication, and that CCM II Miller was merely copied on the document. (Docket No. 1-9).

response. According to plaintiff, this falsification comes from the response's contention that plaintiff's novel "contained inappropriate sexual behavior, [and] sexually explicit materials and pictures." He further alleges that contrary to the response, the Deputy Division Director did not review the book because he did not have enough time. (Docket No. 1 at 14-15).

As to the Unknown Censorship Committee Members, plaintiff claims they "falsely asserted that the novel *Perfect* contained inappropriate sexual behavior, [and] sexually explicit materials and pictures." (Docket No. 1 at 15). To the contrary, plaintiff insists that his book "does not, did not ever, contain inappropriate sexual behavior, [or] sexually explicit materials and pictures." He believes that the "Censorship Committee Members fabricated these falsehoods to deny the novel because" he was the author, and to corroborate "the falsehood created by Henson in denying" him his rights.

Regarding Deputy Division Director Lewis, plaintiff notes that Lewis's grievance appeal response stated that plaintiff's grievance response adequately addressed his complaint. Plaintiff asserts that this constitutes an "affirmation" of the "falsehoods" contained in the grievance response, which was used to deny him "possession of his novel."

Plaintiff generally alleges that "defendants are a close-knit community [that] supports the decisions each other make," even to the point of denying him his constitutional rights. In particular, he states that defendants have "conspired" to deny his "rights to read his published work within the prison," in violation of the First and Fourteenth Amendments."

In the third section of his "Statement of Claim," plaintiff sets forth due process and equal protection claims. Plaintiff begins by outlining what he states is prison policy regarding property. (Docket No. 1 at 16). He states that "packages containing books shall be forwarded to the property room prior to offenders receiving books." At that point, "property staff members shall verify the

8

materials are appropriate in accordance with institutional services procedures regarding censorship."

As before, plaintiff once again repeats that "mailroom staff shall not make censorship decisions." Despite this rule, plaintiff alleges that on "the very date that [his] novel was delivered to the ERDCC mailroom, defendant E. Henson made the decision to censor the work." He further asserts that Henson "did not send the book to the property room staff as required per policy." In light of this purported violation, plaintiff concludes that other defendants "conspired to cover up" this action by "creating and/or [corroborating] the falsehood that the novel contained inappropriate sexual behavior, [and] sexually explicit materials and pictures." For this reason, he insists that defendants denied him due process.

Plaintiff also complains that "defendants did not provide [him] with a written copy of the censorship notice until several weeks after the book was rejected by E. Henson and…Warden Vandergrift." He states that he "was entitled to review the rejected novel, and to a prompt notice…of the reasons for rejection," and that "written notice would have allowed [him] to contest the censors' decision sooner." However, plaintiff asserts that he only received notice after property room staff threatened to dispose of the book.

As a "publisher," plaintiff believes he "is being subjected to a barrier created by the defendants to [separate] him from the protections of the constitution." (Docket No. 1 at 17). Due to these barriers, he claims that his right "to communicate with other prisoners who may want to purchase the novel" and "his right to freely express himself to other prisoners who may want to read [his] ideology" have been denied. Repeating his contention that "defendants have created falsehoods to censor and ban [his] novel," plaintiff states "their regulations or practice…do not further an important or substantial governmental interest."

9

With regard to equal protection, plaintiff accuses defendants of using a "racially discriminatory blanket excuse to justify denying [his] novel" because he "is an African-American author, incarcerated, and his novel is classified/written from a black urban perspective." He alleges that the Missouri Department of Corrections, through the Unknown Censorship Committee Members, the Unknown Warden, the Unknown Acting Warden, Deputy Division Director Lewis, and Deputy Warden Hughes have authorized and approved both fiction and nonfiction books by white authors that "contain strong, violent content." According to plaintiff, the books by white authors "are ordered by the MODOC prison's library staff" and "entered into the prison's library system."

To support this contention, plaintiff provides the example of white author William Johnstone.[2] Plaintiff states that Johnstone has "created [a] series of approximately 30 books… [that] have strong violent content, including rape," as well as racially derogatory language directed at African-Americans. (Docket No. 1 at 18). Johnstone's books also include "strong gun violence" as well as "sexual content." Despite this content, plaintiff states that "these books are bought and paid for with money from the inmate canteen fund, and circulated among the inmate population via the prison's library." He alleges that "defendants do not use a neutral reason for censoring [his] novel" because books written by white authors containing the same material are allowed into the institution.

Attached to the complaint are eleven separate exhibits. The Court has reviewed these exhibits and will treat them as part of the pleadings. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes"). *See also Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011) (stating that "while ordinarily, only the

---

[2] Plaintiff refers to this author as "William Jhonstone."

facts alleged in the complaint are considered in determining whether it states a claim, materials attached to the complaint as exhibits may be considered in construing the sufficiency of the complaint"); and *Pratt v. Corrections Corp. of America*, 124 Fed. Appx. 465, 466 (8th Cir. 2005) (explaining that "the district court was required to consider the allegations not only in [plaintiff's] pro se complaint, but also in his motion to amend, his response to defendants' motion to dismiss, and the attachments to those pleadings").

The first exhibit is an IRR authored by plaintiff and dated July 22, 2022. (Docket No. 1-4). In the IRR, plaintiff complains that his novel, titled *Perfect*, was delivered to the mailroom but not given to him. He states that this was the result of inappropriate censorship by Mailroom Clerk Henson, who wrongly determined that the book contained sexual material, violence, and pictures. (Docket No. 1-5). Plaintiff also contends that his procedural safeguards were violated because the censors must provide him "with notice of censorship, an opportunity to be heard, a prompt decision, and the right to appeal to an official other than the censors." The IRR appears to have been investigated by CCM II Miller, and has also been signed by Functional Unit Manager Boyer, and "Acting AW." (Docket No. 1-4). A checked box indicates that the IRR was "not resolved by discussion."

The second exhibit is an Informal Resolution Response that "found that [plaintiff's] book was censored in accordance with policy and procedure," and that he consented to his book being picked up by his visitor. The response recommends that plaintiff's IRR be denied.

The third exhibit is a duplicate of the first exhibit. (Docket No. 1-7; Docket No. 1-8).

The fourth exhibit is an Inter-Office Communication from Deputy Warden Hughes, dated October 21, 2022. (Docket No. 1-9). The communication is written in response to plaintiff's IRR. In the communication, Hughes writes that plaintiff's novel contains content requiring censorship.

Specifically, Hughes notes that the novel "depicts, describes or encourages activities which may lead to criminal violence or group disruption," and "contains nude pictures or sexually explicit materials." CCM II Miller is copied on the communication, but it is clearly authored by Hughes.

The fifth exhibit is plaintiff's Offender Grievance, dated September 14, 2022. (Docket No. 1-10). In the grievance, plaintiff states that his novel was sent to his institution by Amazon, but that defendant Henson "confiscated" the book and sent it to the censorship committee.

The sixth exhibit is a Warden's Response dated January 4, 2023, and authored by Grievance Officer Sarah Miller. (Docket No. 1-11). In the response, Miller states that she has reviewed plaintiff's IRR, grievance, and other materials, and determined that the response to his IRR adequately addressed his complaint. Miller notes that plaintiff's book "was reviewed by all applicable staff members who determine if the material needs to be censored," and that it was also "reviewed by the DAI deputy division director." Based on those reviews, the book was deemed to contain "inappropriate sexual behavior, [and] sexually explicit materials and pictures." This warranted censorship, meaning that plaintiff would not receive the book.

The seventh exhibit is an Offender Grievance Appeal authored by plaintiff and dated January 12, 2023. (Docket No. 1-12). In the appeal, plaintiff asserts "that the responses provided by the responding staff have all been without verity [and] merit." He further argues "that the entire IRR process has been a sham, and orchestrated to deliberately prolong the IRR-grievance process."

The eighth exhibit is a Grievance Appeal Response authored by Deputy Division Director Lewis and dated February 21, 2023. (Docket No. 1-13). In the response, Lewis states that he has "not found any violation of policy and procedure" regarding the censorship of the novel *Perfect*, and denies plaintiff's appeal.

12

The ninth exhibit is a duplicate of the fifth exhibit, which is plaintiff's Offender Grievance. (Docket No. 1-14). However, this exhibit contains a second page, in which plaintiff states that he received notice of the Censorship Committee's decision, but argues that because he did not receive it immediately, "he was deprived of his right to appeal." (Docket No. 1-15).

The tenth exhibit is a Staff-to-Offender Correspondence from CCM II Miller advising plaintiff to rewrite his grievance on the new form and turn it back in. (Docket No. 1-16).

The final exhibit is a "Declaration of [Verification]" authored by inmate Nathan Clark, who is plaintiff's cellmate. (Docket No. 1-17). According to Clark, plaintiff's grievance of July 2022 was not returned to him until November 2022.

Based on these facts, plaintiff states that his rights under the First and Fourteenth Amendments have been violated. (Docket No. 1 at 19). He asserts that he has been prevented from communicating or expressing his ideology "to the inmate population through his novel *Perfect*," and has begun to "doubt himself as being intelligent enough to write books of any genre to better himself as a person." As such, plaintiff is seeking $10,000 in compensatory damages from each defendant, and $20,000 in punitive damages from each defendant. (Docket No. 1 at 21). He further requests a Court "order allowing his publication to be permitted circulation into the prison system."

## Discussion

Plaintiff is a self-represented litigant who has filed a civil action pursuant to 42 U.S.C. § 1983, alleging violations of his First and Fourteenth Amendment rights with regard to the censoring of a book that he authored and then ordered, but was prevented from receiving. Because he is proceeding in forma pauperis, the Court has reviewed his complaint under 28 U.S.C. § 1915.

Based on that review, and for the reasons discussed below, the Court will dismiss the official capacity claims against all the defendants, except for the claim against defendant Lewis. The Court will also dismiss the First Amendment and Fourteenth Amendment claims against defendants Boyer, Unknown Acting Warden, Unknown Chief Administrator, and Sarah Miller in their individual capacities. The Court will dismiss all the Fourteenth Amendment claims against Hughes, Michael Miller, and Lewis. The Court will dismiss plaintiff's equal protection claim under the Fourteenth Amendment only against defendant E. Henson. The Court will direct the Clerk of Court to issue process on defendant Jason Lewis in both his official and individual capacities as to plaintiff's claims under the First Amendment and for conspiracy; on defendants Hughes, Michael Miller, Henson, and the Unknown Censorship Committee members in their individual capacities as to plaintiff's claims under the First Amendment and for conspiracy; and on defendant Henson in her individual capacity as to plaintiff's due process claim under the Fourteenth Amendment.

## A.  Official Capacity Claims

Plaintiff has sued all twelve defendants in their official capacities. In an official capacity claim against an individual, the claim is actually "against the governmental entity itself." *See White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir. 2017). Thus, a "suit against a public employee in his or her official capacity is merely a suit against the public employer." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). *See also Brewington v. Keener*, 902 F.3d 796, 800 (8th Cir. 2018) (explaining that official capacity suit against sheriff and his deputy "must be treated as a suit against the County"); *Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1075 (8th Cir. 2016) (stating that a "plaintiff who sues public employees in their official, rather than individual, capacities sues only the public employer"); and *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir.

2006) (stating that a "suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent").

Here, each of the twelve defendants are alleged to be employed by the Missouri Department of Corrections, an arm of the State of Missouri. As such, the official capacity claims are treated as being made against the state itself, defendants' employer.

### i.   Official Capacity Claims for Money Damages Against All Defendants

Plaintiff's official capacity claims for money damages against all defendants must be dismissed for two reasons. First, 42 U.S.C. § 1983 "provides for an action against a 'person' for a violation, under color of law, of another's civil rights." *McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008). *See also Deretich v. Office of Admin. Hearings*, 798 F.2d 1147, 1154 (8th Cir. 1986) (stating that "[§] 1983 provides a cause of action against persons only"). However, "neither a State nor its officials acting in their official capacity are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). *See also Calzone v. Hawley*, 866 F.3d 866, 872 (8th Cir. 2017) (explaining that a "State is not a person under § 1983"); and *Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016) (explaining that "a state is not a person for purposes of a claim for money damages under § 1983"). Because the State of Missouri is not a § 1983 "person" for purposes of his claims for money damages, plaintiff has failed to establish the first element of a § 1983 action.

Second, plaintiff's official capacity claims for money damages are barred by sovereign immunity. "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). The Eleventh Amendment has been held to confer sovereign immunity on an un-consenting state from lawsuits brought in federal court by a state's own citizens or the citizens of another state. *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). *See also Webb v. City of Maplewood*, 889 F.3d 483, 485 (8th

Cir. 2018) ("The Eleventh Amendment protects States and their arms and instrumentalities from suit in federal court"); and *Dover Elevator Co. v. Ark. State Univ.*, 64 F.3d 442, 446 (8th Cir. 1995) ("The Eleventh Amendment bars private parties from suing a state in federal court"). The Eleventh Amendment also bars suit against a state official sued in an official capacity for money damages. *See Andrus ex rel. Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999) ("A claim for damages against a state employee in his official capacity is barred under the Eleventh Amendment").

There are two "well-established exceptions" to the sovereign immunity provided by the Eleventh Amendment. *Barnes v. State of Missouri*, 960 F.2d 63, 64 (8th Cir. 1992). "The first exception to Eleventh Amendment immunity is where Congress has statutorily abrogated such immunity by clear and unmistakable language." *Id*. The second exception is when a state waives its immunity to suit in federal court. *Id*. at 65. A state will be found to have waived its immunity "only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 473 (1987). Neither exception is applicable in this case.

The first exception is inapplicable because the Supreme Court has determined that 42 U.S.C. § 1983–under which this case arises–does not revoke a state's Eleventh Amendment immunity from suit in federal court. *See Will*, 491 U.S. at 66 ("We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent"); and *Quern v. Jordan*, 440 U.S. 332, 341 (1979) ("[W]e simply are unwilling to believe…that Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States"). The second exception also does not apply because the State of Missouri has not waived its sovereign immunity in this type of case. *See* RSMo § 537.600 (explaining that sovereign immunity is "in effect," and providing exceptions relating to the

16

"negligent acts or omissions by public employees arising out of the operation of motor vehicles…within the course of their employment," and regarding "[i]njuries caused by the condition of a public entity's property").

In this case, sovereign immunity bars plaintiff's claims for damages against state officials acting in their official capacities. Furthermore, no exception to sovereign immunity is present in the complaint. Therefore, for this reason as well, plaintiff's official capacity claims for money damages against all defendants must be dismissed.

### ii.     Official Capacity Claims for Prospective Injunctive Relief

Plaintiff also seeks injunctive relief in this case, specifically an order directing that his book be allowed within the prison system. As noted above, the Eleventh Amendment "protects States and their arms and instrumentalities from suit in federal court." *Webb*, 889 F.3d at 485. While this prevents an official capacity claim for money damages, "a private party may sue state officials in their official capacities for prospective injunctive relief." *McDaniel v. Precythe*, 897 F.3d 946, 952 (8th Cir. 2018). To determine whether this exception applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id*.

A suit for injunctive or declaratory relief avoids Eleventh Amendment immunity as long as "the official has some connection to the enforcement of the challenged laws." *Calzone*, 866 F.3d at 869. *See also Missouri Protection and Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007) (explaining that a "State's Eleventh Amendment immunity does not bar a suit against a state official to enjoin enforcement of an allegedly unconstitutional statute, provided that such officer has some connection with the enforcement of the act"). "Absent that connection, the

officer is merely a representative of the state, and Eleventh Amendment immunity applies." *Duit Const. Co. Inc. v. Bennett*, 796 F.3d 938, 940 (8th Cir. 2015).

For the required connection to exist, the named defendant or defendants must possess the authority to enforce the complained-of provision. *See Calzone*, 866 F.3d at 869. *See also Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015) ("When a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision"). "[A] state official's requisite connection with the enforcement of a statute may arise out of the general law or be specially created by the act itself." *Calzone*, 866 F.3d at 870.

  a. **Official Capacity Claims Against Defendants Hughes, Michael Miller, Boyer, Unknown Acting Warden, Unknown Chief Administrative Officer, Sarah Miller, Henson, and Unknown Censorship Committee Members for Injunctive Relief are Moot**

Plaintiff has sued all twelve defendants in their official capacities. Eleven of these defendants–Hughes, Michael Miller, Boyer, Unknown Acting Warden, Unknown Chief Administrative Officer, Sarah Miller, Henson, and Unknown Censorship Committee Members– are alleged to be employees at the ERDCC. However, plaintiff is no longer incarcerated at the ERDCC, as he has been transferred to another institution. More specifically, plaintiff notified the Court on April 25, 2023 that he has been moved to Crossroads Correctional Center in Cameron, Missouri. (Docket No. 6).

Because plaintiff has been transferred to Crossroads, the ERDCC employees are no longer in a position to enforce the complained-of policy. That is, ERDCC employees do not have the authority to direct that plaintiff receive a copy of his book in Crossroads, and thus, cannot provide the injunctive relief he requests. Thus, plaintiff's request for injunctive relief against the eleven

ERDCC employees is moot. *See Gladson v. Iowa Dept. of Corrections*, 551 F.3d 825, 835 (8th Cir. 2009) (determining that since former Iowa State Penitentiary inmate was "no longer incarcerated at the ISP and subject to the allegedly offending policy, his claims [for injunctive relief] are moot"); *Walker v. Bowersox*, 526 F.3d 1186, 1189 (8th Cir. 2008) (stating that inmate's requests for injunctive relief were moot because he was no longer incarcerated at the South Central Correctional Center, but was in another prison); *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999) (explaining that "an inmate's claims for declaratory and injunctive relief to improve prison conditions were moot when he was transferred to another facility and was no longer subject to those conditions"); and *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (stating that "a prisoner's claim for injunctive relief to improve prison conditions is moot if he or she is no longer subject to those conditions").

For these reasons, the official capacity claims for prospective injunctive relief against defendants Hughes, Michael Miller, Boyer, Unknown Acting Warden, Unknown Chief Administrative Officer, Sarah Miller, Henson, and the Unknown Censorship Committee Members must be dismissed as moot.

### b. Official Capacity Claim Against Deputy Division Director Lewis for Prospective Injunctive Relief

Unlike plaintiff's claims for injunctive relief against the eleven ERDCC defendants, his official capacity claim against Deputy Division Director Lewis is not moot. As with the other defendants, Lewis is alleged to be employed by the Missouri Department of Corrections. However, he is not based at the ERDCC. Instead, plaintiff asserts that Lewis works in Jefferson City, and is the Deputy Division Director for the Division of Adult Institutions. The inference to be drawn is that Lewis has authority over all Missouri prisons, not just the ERDCC. Plaintiff has also attached

an exhibit showing that Lewis reviewed the application of the censorship policy in plaintiff's case, and decided that no violation had occurred.

For purposes of initial review under 28 U.S.C. § 1915(e), the Court must "accept the complaint's factual allegations as true and view them in the light most favorable to the plaintiff." *See Rinne v. Camden County*, 65 F.4th 378, 383 (8th Cir. 2023). Doing so, the Court has determined that plaintiff has sufficiently alleged that Deputy Division Director Lewis has some connection to the enforcement of the challenged policy. Therefore, the Court will direct the Clerk of Court to issue process on defendant Lewis in his official capacity as to plaintiff's claim for prospective injunctive relief under the First Amendment. The Court cautions plaintiff that this is only a preliminary determination based solely on the allegations contained in the complaint. This is not a determination of the merits of his claim or potential defenses thereto.

### B. Individual Capacity Claims

Plaintiff has also sued all defendants in their individual capacities. Individual liability in a 42 U.S.C. § 1983 case is personal. *See Frederick v. Motsinger*, 873 F.3d 641, 646 (8th Cir. 2017). In other words, "[g]overnment officials are personally liable only for their own misconduct." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). As such, § 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights." *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) (quoting *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990)). *See also Kohl v. Casson*, 5 F.3d 1141, 1149 (8th Cir. 1993) (dismissing plaintiff's excessive bail claims because none of the defendants set plaintiff's bail, and therefore, "there can be no causal connection between any action on the part of the defendants and any alleged deprivation" of plaintiff's rights). To that end, a plaintiff must allege facts connecting the defendant to the challenged action. *See Bitzan v. Bartruff*, 916 F.3d 716, 717 (8th Cir. 2019).

Here, plaintiff has sued twelve separate defendants in their individual capacities. To state a claim against each, he must show how that person personally deprived him of his constitutional rights.

### i.     First Amendment Claims

Plaintiff has accused defendants of violating the First Amendment by improperly censoring the novel he wrote and then attempted to have delivered to his correctional facility. The Supreme Court has "held that sentenced prisoners enjoy freedom of speech and religion under the First and Fourteenth Amendments." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). As such, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). In other words, "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). *See also Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989) (explaining that in the context of First Amendment rights in prison, "the relevant inquiry is whether the actions of prison officials were reasonably related to legitimate penological interests").

In order "to determine when a regulation that impinges on inmates' constitutional rights is reasonably related to legitimate penological interests," the Supreme Court "has articulated a two-step, four-factor test." *Sisney v. Kaemingk*, 15 F.4th 1181, 1190 (8th Cir. 2021). "The first factor operates as a threshold condition that the regulation must satisfy to pass constitutional muster." *Id*. If the regulation satisfies the threshold requirement, the court must balance the remaining three factors to determine the regulation's constitutionality. *Id*.

Due to the nature of correctional facilities, "prison officials may lawfully censor prison mail that is detrimental to the security, good order, and discipline of the institution." *Kaden v.*

*Slykhuis*, 651 F.3d 966, 968 (2011). The four factors identified by the Supreme Court that are "relevant to this inquiry [are]: (1) whether the policy has a valid rational connection to a legitimate governmental interest; (2) whether alternative means are open to…inmates to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and (4) whether there are ready alternatives to the policy." *Human Rights Defense Center v. Baxter County Arkansas*, 999 F.3d 1160, 1164 (8th Cir. 2021). When reviewing these factors, a court must give "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

### a. First Amendment Claims Against Defendants Hughes, Michael Miller, Lewis, Henson, and Unknown Censorship Committee Members

Plaintiff has adequately asserted First Amendment claims against defendants Hughes, Michael Miller, Lewis, Henson, and Unknown Censorship Committee Members for purposes of initial review.

With regard to Henson, plaintiff has asserted that Henson censored his novel based on her personal beliefs, and that her determination that his novel contained inappropriate sexual material and pictures was inaccurate.

As to Deputy Warden Hughes and CCM II Michael Miller, plaintiff alleges the defendants falsified reasons for censoring his novel. Plaintiff has also attached an Inter-Office Communication authored by Hughes and signed by CCM II Miller, in which Hughes advises that the novel is being censored for including material that may lead to criminal violence or group disruption, and for containing sexually explicit materials or pictures. However, plaintiff insists that his novel contains no such material.

Likewise, plaintiff states that Deputy Division Director Lewis provided false reasons for the censoring of his novel. Plaintiff has also produced a Grievance Appeal Response that shows Lewis reviewed the book and determined it merited censorship. While plaintiff goes to some lengths to contest whether or not Lewis had time to actually look at his novel, there is clearly the suggestion that Lewis had authority to either censor it or allow plaintiff to have it.

Concerning the Unknown Censorship Committee Members, plaintiff's facts and exhibits establish that the Committee's role was to determine whether printed material violated correctional policies with regard to content. According to plaintiff, the Censorship Committee decided to censor his book not based on prohibited content, but to give validity to Mailroom Clerk Henson's original, allegedly improper decision.

The Court must accept the allegations contained in the complaint as true and make all reasonable inferences in plaintiff's favor. *See Jones v. Douglas Cty. Sheriff's Dep't*, 915 F.3d 498, 499 (8th Cir. 2019). Furthermore, when evaluating whether a self-represented plaintiff has asserted sufficient facts to state a claim, a *pro se* complaint, however inartfully pleaded, is held to less stringent standards than formal pleadings drafted by lawyers. *Jackson v. Nixon*, 747 F.3d 537, 541 (8th Cir. 2014).

Giving plaintiff's complaint a liberal construction, plaintiff's facts indicate that defendants Lewis, Henson, Hughes, Michael Miller, and Unknown Censorship Committee Members each had personal responsibility for making censorship decisions about his novel. He has further asserted that these decisions were improper, as his book did not contain prohibited material. To the contrary, plaintiff states that defendant Henson wrongfully censored his book based on her personal beliefs, and that Hughes, Michael Miller, Lewis, and the Censorship Committee affirmed this decision to

protect Henson. The inference to be drawn is that defendants lacked a legitimate governmental interest in censoring plaintiff's book.

For these reasons, the Court will direct the Clerk of Court to issue process on defendants Hughes, Michael Miller, Lewis, Henson, and Unknown Censorship Committee Members in their individual capacities as to plaintiff's claims under the First Amendment.

### b. First Amendment Claims Against Defendants Sarah Miller and Boyer

Plaintiff has not stated First Amendment claims against defendants Sarah Miller and Functional Unit Manager Boyer, as none of them are alleged to have been personally responsible for censoring plaintiff's novel.

Regarding Grievance Officer Sarah Miller, based on the Complaint, she did nothing more than fill out and sign a Warden's Response letting plaintiff know that his book had been reviewed by applicable staff members. As to Functional Unit Manager Boyer, there are no factual allegations against him, other than that he also signed plaintiff's IRR.

None of these facts demonstrate that Sarah Miller or Boyer were personally responsible for unconstitutionally censoring his book. In other words, plaintiff does not assert that they had the responsibility to review the contents of his novel, much less the authority to make a decision whether or not he could receive it. At most, they relayed to plaintiff the fact that others had reviewed his book and deemed it prohibited. This does not establish that these two defendants personally did anything to violate his constitutional rights.

The Court further notes that even if these two defendants violated the ERDCC grievance procedure, such a violation does not rise to the level of a constitutional infringement here. An inmate has a liberty interest in the nature of his confinement, but not an interest in the procedures by which the state believes it can best determine how he should be confined. *Kennedy v.*

*Blankenship*, 100 F.3d 640, 643 (8ᵗʰ Cir. 1996). As such, "there is no constitutional liberty interest in having state officers follow state law or prison officials follow prison regulations." *Phillips v. Norris*, 320 F.3d 844, 847 (8ᵗʰ Cir. 2003). *See also Jenner v. Nikolas*, 828 F.3d 713, 716-17 (8ᵗʰ Cir. 2016) (explaining that "[t]he existence of a state-mandated procedural requirement does not, in and of itself, create a constitutionally protected liberty interest"). To that end, a prison grievance procedure is a procedural right only and does not confer upon an inmate a substantive right. *Buckley v. Barlow*, 997 F.2d 494, 495 (8ᵗʰ Cir. 1993). *See also Lomholt v. Holder*, 287 F.3d 683, 684 (8ᵗʰ Cir. 2002) (agreeing with district court that "defendants' denial of [plaintiff's] grievances did not state a substantive constitutional claim"); and *Fallon v. Coulson*, 5 F.3d 531, 1993 WL 349355, at *1 (8ᵗʰ Cir. 1993) (unpublished opinion) (stating that the failure of defendants "to acknowledge receipt of and respond to plaintiffs' grievances pursuant to prison procedure did not violate any of plaintiffs' constitutional rights").

For all of these reasons, plaintiff has not stated individual capacity claims against defendants Sarah Miller and Boyer under the First Amendment. Therefore, these claims must be dismissed.

### c.  First Amendment Claims Against Defendants Unknown Acting Warden and Unknown Chief Administrative Officer

Plaintiff has also failed to state individual capacity claims against the Unknown Acting Warden and the Unknown Chief Administrative Officer, because he has not demonstrated their personal responsibility. Vicarious liability is inapplicable in 42 U.S.C. § 1983 suits. *Marsh v. Phelps Cty.*, 902 F.3d 745, 754 (8ᵗʰ Cir. 2018). Rather, "[g]overnment officials are personally liable only for their own misconduct." *S.M.*, 808 F.3d at 340. Thus, "a supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." *Parrish*

*v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). *See also Morris v. Cradduck*, 954 F.3d 1055, 1060 (8th Cir. 2020) ("To state a claim against a supervisor, a plaintiff must show that the supervising official, through his own individual actions, violated the Constitution"). The Court further notes the "general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). *See also Reynolds v. Dormire*, 636 F.3d 976, 981 (8th Cir. 2011) (explaining "that a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement").

Here, plaintiff asserts no factual allegations that either of these defendants personally reviewed plaintiff's book and issued a censorship decision. Instead, the claim against the Unknown Acting Warden consists of plaintiff's assertion that the Unknown Acting Warden signed the original IRR, and that a Warden's Response was issued denying his grievance. As to the Unknown Chief Administrative Officer, there are no allegations whatsoever in the complaint stating what this person did or did not do. The Court observes, though, that the Chief Administrative Officer has approved the contents of the Warden's Response, which was authored by Grievance Officer Sarah Miller and attached as an exhibit.

Rather than providing facts to support the premise that the Unknown Acting Warden and Chief Administrative Officer are liable for violating his constitutional rights, plaintiff relies on the Warden's Response to make his claim. As already noted, the Warden's Response has been written by Grievance Officer Sarah Miller, and it provides that "the material was reviewed by all applicable staff members," and also "reviewed by the DAI deputy division director."[3] At no point in the Warden's Response is there any indication that the Acting Warden or Chief Administrative

---

[3] This is a reference to Division of Adult Institutions Deputy Division Director Jason Lewis.

26

Officer reviewed the book personally, or took any direct action regarding censorship of the book. As such, plaintiff has failed to provide the facts necessary to support a causal connection between an action on the part of the Acting Warden and Chief Administrative Officer, and the violation of plaintiff's First Amendment rights.

For these reasons, plaintiff has failed to state individual capacity claims against the Unknown Acting Warden and Unknown Chief Administrative Officer under the First Amendment. Therefore, these claims must be dismissed.

ii. **Conspiracy**

Throughout his "Statement of Claim," plaintiff asserts that defendants conspired together to censor his book based on false reasons. To the extent that he is attempting to state a 42 U.S.C. § 1983 conspiracy claim, however, the Court notes he has not provided any factual support for some defendants.

"To prove a [42 U.S.C.] § 1983 conspiracy claim against a particular defendant, the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). *See also Burbridge v. City of St. Louis, Missouri*, 2 F.4th 774, 782-83 (8th Cir. 2021) (explaining that "[t]o prevail on a § 1983 conspiracy claim, [the plaintiff] must show that (1) the defendants agreed to deprive him of his constitutional rights; (2) at least one of the alleged coconspirators engaged in an overt act in furtherance of the conspiracy; and (3) [the plaintiff] was injured by the overt act").

Additionally, in order to prevail, the plaintiff is required to prove the deprivation of a constitutional right or privilege. *Riddle v. Riepe*, 866 F.3d 943, 948 (8th Cir. 2017). *See also Draper*

*v. City of Festus, Mo.*, 782 F.3d 948, 953 (8th Cir. 2015). "Absent a constitutional violation, there is no actionable conspiracy claim." *In re Kemp*, 894 F.3d 900, 910 (8th Cir. 2018).

With regard to the first element, a "plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Holmes v. Slay*, 895 F.3d 993, 1001 (8th Cir. 2018). In other words, there has to be some showing of "a meeting of the minds or understanding among the conspirators to achieve the conspiracy's aims." *See White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008). This burden can be satisfied by a plaintiff "pointing to at least some facts which would suggest the defendants reached an understanding to violate his rights." *Boneberger v. St. Louis Metropolitan Police Dept.*, 810 F.3d 1103, 1109 (8th Cir. 2016).

Plaintiff makes several allegations that defendants generally "conspired" against him. But without specific facts of each defendants wrongdoing, plaintiff's claim must fail. *See Pitts v. City of Cuba*, 913 F. Supp. 2d 688, 708 (E.D. Mo. 2012) (noting specific facts must "show[ ] what each named defendant allegedly did, or failed to do, that allegedly violated the plaintiff's federal constitutional rights"); *Manning v. Cotton*, 862 F.3d 663, 669 (8th Cir. 2017) (noting that a person may only be held liable for a constitutional violation if his or her own conduct violated a clearly established constitutional right). Plaintiff does allege specific facts that defendants Henson, Lewis, Hughes, Michael Miller, and Unknown Censorship Committee Members "reached an understanding," *Boneberger*, 810 F.3d at 1109, to falsify facts to "perpetuate" Henson's "falsehood" in order to deprive Plaintiff of his rights to the First Amendment. Plaintiff does not make similar specific allegations against Boyer, Sarah Miller, Unknown Acting Warden, or Unknown Chief Administrator.

For these reasons, and to the extent that plaintiff seeks to assert 42 U.S.C. § 1983 conspiracy claims against defendants in their individual capacities, the Court will direct the Clerk

of Court to issue process on defendants Henson, Lewis, Hughes, Michael Miller, and the Unknown Censorship Committee Members in their individual capacities as to plaintiff's conspiracy claims and dismiss the conspiracy claims against defendants Boyer, Sarah Miller, Unknown Acting Warden, and Unknown Chief Administrator.

### iii.     Due Process

Plaintiff has asserted a claim under the Due Process Clause of the Fourteenth Amendment. The Fourteenth Amendment provides, in part, that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. For procedural due process claims, there is a two-step analysis: first, "whether there exists a liberty or property interest of which a person has been deprived," and second, if a liberty interest exists, "whether the procedures followed by the State were constitutionally sufficient." *Jenner*, 828 F.3d at 716. Before reaching the issue as to what process is due, a "plaintiff must first show [the] deprivation of a constitutionally protected life, liberty, or property interest." *See Rochling v. Department of Veterans Affairs*, 725 F.3d 927, 931 (8th Cir. 2013). Unless there has been a constitutional deprivation, there is no need to determine what process is due. *See Singleton v. Cecil*, 155 F.3d 983, 987 (8th Cir. 1998) (explaining that to claim a due process violation, plaintiff has to be deprived of either life, liberty, or property, otherwise "it does not matter whether one has received due process or not").

In this case, plaintiff has alleged that he has been prevented from receiving a book that he published, and then had delivered to his correctional facility. The Supreme Court has determined that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a liberty interest within the meaning of the Fourteenth Amendment even though qualified by necessity by the circumstance of imprisonment."

*Procunier v. Martinez*, 416 U.S. 396, 417 (1974), overruled on other ground by *Thornburgh v. Abbott*, 490 U.S. 401 (1989). As such, an inmate is entitled to "minimum procedural safeguards" when a decision is made to censor or withhold delivery of incoming mail. *Id*. These minimum safeguards consist of "a requirement that an inmate be notified of the rejection and have a reasonable opportunity to protest the decision." *Bonner v. Outlaw*, 552 F.3d 673, 676 (8th Cir. 2009). *See also Lane v. Lombardi*, 2012 WL 5783577, at *4 (W.D. Mo. 2012) ("Failure to provide due process regarding a censorship decision – here, notification and an appeals process – interferes with the protected liberty rights of both senders and inmate recipients"). As the Eighth Circuit has stated, "case law is clear that an inmate has a right to procedural due process—including notice— whenever any form[4] of correspondence addressed to that inmate is rejected." *Bonner v. Outlaw*, 552 F.3d at 678.

### a.  Due Process Claim Against Defendant Henson

As discussed above, the first step in a due process claim is determining the existence of a liberty interest. Here, plaintiff has a liberty interest in receiving uncensored communication, "qualified by necessity by the circumstance of imprisonment." Because there is a liberty interest, plaintiff is entitled to certain minimal procedural safeguards, which in this case, consists of notice and an opportunity to appeal. Plaintiff alleges Henson, the mailroom clerk, improperly censored his book and then failed to provide plaintiff with notice that his book was rejected for over a month. Plaintiff further alleges he suffered harm from the delay in receiving notice.

For these reasons, the Court will direct the Clerk of Court to issue process on defendant Henson in her individual capacity under the Due Process Clause of the Fourteenth Amendment.

---

[4] The Eighth Circuit explained that an inmate's interest in "uncensored communication," meaning the liberty interest protected by the due process clause, applies "regardless of whether that communication occurs in the form of a letter, package, newspaper, magazine, etc." *Bonner v. Outlaw*, 552 F.3d at 677.

### b.   Due Process Claims Against Other Defendants

Aside from defendant Henson, plaintiff does not identify any other specific defendant as having violated his right to due process.[5] Instead, he refers to all the defendants collectively, as a single monolithic group. As previously discussed, this is not sufficient to state a claim, as liability under 42 U.S.C. § 1983 is personal. *See S.M.*, 808 F.3d at 340 ("Government officials are personally liable only for their own misconduct"). Moreover, this type of pleading does not give each defendant the requisite notice of the claim against them. *See Tatum v. Iowa*, 822 F.2d 808, 810 (8th Cir. 1987) ("While all pleadings are to be construed to do substantial justice…the pleading must at a minimum be sufficient to give the defendant notice of the claim"); and *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) ("The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved").  Aside from Henson, Plaintiff fails to allege each defendant's role, if any, in the alleged due process violation.  More to point, plaintiff never alleges that he attempted to appeal the censorship decision and was prevented from so doing.  Therefore, plaintiff's individual capacity claims against the remaining defendants under the Due Process Clause of the Fourteenth Amendment must be dismissed.

### iv.   Equal Protection

Plaintiff has also asserted an equal protection claim under the Fourteenth Amendment. "The Equal Protection Clause generally requires the government to treat similarly situated people alike." *Klinger v. Dep't of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994). The dissimilar treatment of

---

[5] In the section of the "Statement of Claim" focused on due process, plaintiff identifies only one defendant by name: Mailroom Clerk Henson. To support the claim, plaintiff states that Henson "made the decision to censor the work," and failed to "send the book to the property room staff as required per policy."

dissimilarly situated people does not violate equal protection. *Id*. As such, the first step in an equal protection case is determining whether the plaintiff has demonstrated that he or she was treated differently than others who were similarly situated. *In re Kemp*, 894 F.3d 900, 909 (8th Cir. 2018). Unless the plaintiff can make a threshold showing that he or she is similarly situated to those who allegedly received favorable treatment, the plaintiff does not have a viable equal protection claim. *Id*. The plaintiff must also show that "the different treatment is based upon either a suspect classification or a fundamental right." *Patel v. U.S. Bureau of Prison*s, 515 F.3d 807, 815 (8th Cir. 2008).

Here, plaintiff asserts that the Censorship Committee Members, the Unknown Acting Warden, the Deputy Warden, and the Deputy Division Director all "authorize and approve non-fictional and fictional books authored by white" authors, and "which contain strong violent content." Specifically, he points to white author William Johnstone whose books contain sexual content and violence, and which have been allowed in the ERDCC library. He states that "defendants do not use a neutral reason for censoring [his] novel *Perfect*" because they "allow books into the institution written by white authors and containing the same materials they claimed to have banned [his] novel for."

These allegations are insufficient to demonstrate the personal responsibility of each of these defendants. More particularly, plaintiff proffers no facts showing that each individual defendant personally treated plaintiff different from white authors. For example, none of these defendants are alleged to have been responsible for approving the books written by William Johnstone. Likewise, none of these defendants are alleged to have been personally responsible for censoring plaintiff's book on the basis of his race. Indeed, plaintiff's earlier allegations suggest his

belief that Mailroom Clerk Henson censored the book based on its purported content, while other defendants wrongfully upheld that decision.

As discussed above, to assert individual liability, plaintiff must present a causal connection between the actions of each separate defendant, and the violation of one of plaintiff's constitutional rights. *See Mayorga*, 442 F.3d at 1132. "While all pleadings are to be construed to do substantial justice…the pleading must at a minimum be sufficient to give the defendant notice of the claim." *See Tatum*, 822 F.2d at 810. Plaintiff's allegations, however, do not give each defendant notice of the basis of his claim, but treats the individuals as a single group. Moreover, instead of providing factual allegations showing what these defendants did or did not do, plaintiff provides a legal conclusion and sets forth a recitation of the elements of an equal protection claim. This is not sufficient to state a claim. *See Hamilton v. Palm*, 621 F.3d 816, 817-18 (8th Cir. 2010) (explaining that "[a] pleading that merely pleads labels and conclusions, or a formulaic recitation of the elements of a cause of action, or naked assertions devoid of factual enhancement will not suffice").

For all of these reasons, plaintiff has not stated a claim under the Equal Protection Clause of the Fourteenth Amendment. Therefore, this claim must be dismissed.

**C. Motion to Appoint Counsel**

Plaintiff has filed a motion to appoint counsel. (Docket No. 3). In civil cases, a *pro se* litigant does not have a constitutional or statutory right to appointed counsel. *Ward v. Smith*, 721 F.3d 940, 942 (8th Cir. 2013). Rather, a district court may appoint counsel in a civil case if the court is "convinced that an indigent plaintiff has stated a non-frivolous claim…and where the nature of the litigation is such that plaintiff as well as the court will benefit from the assistance of counsel." *Patterson v. Kelley*, 902 F.3d 845, 850 (8th Cir. 2018). When determining whether to appoint counsel for an indigent litigant, a court considers relevant factors such as the complexity

33

of the case, the ability of the pro se litigant to investigate the facts, the existence of conflicting testimony, and the ability of the pro se litigant to present his or her claim. *Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006).

After reviewing these factors, the Court finds that the appointment of counsel is not warranted at this time. Plaintiff has demonstrated, at this point, that he can adequately present his claims to the Court. Additionally, neither the factual nor the legal issues in this case appear to be complex. The Court will entertain future motions for appointment of counsel as the case progresses.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for leave to proceed in forma pauperis, Doc. [2], is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff must pay an initial partial filing fee of $8.37 within twenty-one (21) days of the date of this order. Plaintiff is instructed to make his remittance payable to "Clerk, United States District Court," and to include upon it: (1) his name; (2) his prison registration number; (3) the case number; and (4) the statement that the remittance is for an original proceeding.

**IT IS FURTHER ORDERED** that plaintiff's motion for appointment of counsel, Doc. [3], is **DENIED** at this time.

**IT IS FURTHER ORDERED** that the Clerk of Court shall issue process or cause process to issue on defendant Jason Lewis as to plaintiff's official capacity claim for prospective injunctive relief. Defendant shall be served in accordance with the waiver agreement the Court maintains with the Missouri Attorney General's Office.

34

**IT IS FURTHER ORDERED** that the Clerk of Court shall issue process or cause process to issue on defendants Allen Hughes, Jason Lewis, Michael Miller, E. Henson, and the Unknown Censorship Committee Members in their individual capacities as to plaintiff's claims under the First Amendment. Defendants shall be served in accordance with the waiver agreement the Court maintains with the Missouri Attorney General's Office.

**IT IS FURTHER ORDERED** that the Clerk of Court shall issue process or cause process to issue on defendants Allen Hughes, Jason Lewis, Michael Miller, E. Henson, and the Unknown Censorship Committee Members in their individual capacities as to plaintiff's conspiracy claim under 42 U.S.C. § 1983.  Defendants shall be served in accordance with the waiver agreement the Court maintains with the Missouri Attorney General's Office.

**IT IS FURTHER ORDERED** that the Clerk of Court shall issue process or cause process to issue on defendant E. Henson in her individual capacity as to plaintiff's due process claim under the Fourteenth Amendment.  Defendant shall be served in accordance with the waiver agreement the Court maintains with the Missouri Attorney General's Office.

**IT IS FURTHER ORDERED** that plaintiff's official capacity claims against defendants Allen Hughes, Michael Miller, Brian Boyer, Unknown Acting Warden, Unknown Chief Administrator, Sarah Miller, E. Henson, and the Unknown Censorship Committee Members are **DISMISSED** without prejudice. *See* 28 U.S.C. § 1915(e)(2)(B). A separate order of partial dismissal will be entered herewith.

**IT IS FURTHER ORDERED** that plaintiff's individual capacity claims under the First Amendment against defendants Brian Boyer, Sarah Miller, Unknown Acting Warden, and Unknown Chief Administrator are **DISMISSED** without prejudice. *See* 28 U.S.C. § 1915(e)(2)(B). A separate order of partial dismissal will be entered herewith.

**IT IS FURTHER ORDERED** that plaintiff's individual capacity claims under 42 U.S.C. § 1983 for conspiracy against defendants Brian Boyer, Sarah Miller, Unknown Acting Warden, and Unknown Chief Administrator, are **DISMISSED** without prejudice. *See* 28 U.S.C. § 1915(e)(2)(B). A separate order of partial dismissal will be entered herewith.

**IT IS FURTHER ORDERED** that plaintiff's individual capacity claims under the Fourteenth Amendment against defendants Allen Hughes, Michael Miller, Jason Lewis, Brian Boyer, Unknown Acting Warden, Unknown Chief Administrative Officer, Sarah Miller, and Unknown Censorship Committee Members are **DISMISSED** without prejudice. *See* 28 U.S.C. § 1915(e)(2)(B). A separate order of partial dismissal will be entered herewith.

**IT IS FURTHER ORDERED** that plaintiff's equal protection claim under the Fourteenth Amendment against defendant E. Henson is **DISMISSED** without prejudice. *See* 28 U.S.C. § 1915(e)(2)(B). A separate order of partial dismissal will be entered herewith.

**IT IS FINALLY ORDERED** that an appeal from this order of partial dismissal would not be taken in good faith.

Dated this 29th day of June, 2023.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE